UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D N.Y

★ MAY 0 6 2010 ★

BROOKLYN OFFICE

--------------------------------------------------------------X

COREY M. SIMONS,

                                    Plaintiff,

        -against-

THOMAS H. MILHORAT, M.D., PAOLO A.
BOLOGNESE, M.D., SOL MORA, M.D., L.
THIERRY REMY, M.D.MISAO NISHIKAWA,
M.D., NORTH SHORE – LONG ISLAND JEWISH
HEALTH SYSTEM, INC. , THE CHIARI
INSTITUTE, an unincorporated entity of North
Shore University Hospital, and HARVEY
CUSHING INSTITUTES OF NEUROSCIENCE, an
unincorporated entity of North Shore University
Hospital,

                                    Defendants.

Civil Action No.:

CV 10

VERIFIED
COMPLAINT AND
DEMAND FOR
JURY TRIAL

WEXLER J

ORENSTEIN, M.J.

--------------------------------------------------------------X

Plaintiff, **COREY M. SIMONS** by his attorneys, **GOLDSMITH CTORIDES &**

**RODRIGUEZ, LLP** and **THE LOCKS LAW FIRM, PLLC,** as and for his Complaint against

the Defendants, alleges upon information and belief, as follows:

### PRELIMINARY STATEMENT

1.      This case arises out of medical care and treatment received by the Plaintiff,

**COREY M. SIMONS,** at **THE CHIARI INSTITUTE,** an unincorporated entity of North

Shore University Hospital, **NORTH SHORE – LONG ISLAND JEWISH HEALTH**

**SYSTEM, INC. and the HARVEY CUSHING INSTITUTES OF NEUROSCIENCE,** an

unincorporated entity of North Shore University Hospital, from Defendants, **THOMAS H.**

**MILHORAT, M.D., PAOLO A. BOLOGNESE M.D., SOL MORA, M.D., L. THIERRY**

**REMY, M.D. and MISAO NISHIKAWA, M.D.** between October 31, 2007 and December 18,

2007.

2.     The Defendants falsely advised the Plaintiff, **COREY M. SIMONS**, that he was suffering from tethered cord syndrome which was contributing to and causing his Chiari Malformation and that he required surgery on the tethered cord to treat the Chiari Malformation.

3.     On December 14, 2007 Defendants negligently performed spinal cord untethering surgery upon the Plaintiff, **COREY M. SIMONS**, on the premises of Defendant, **NORTH SHORE – LONG ISLAND JEWISH HEALTH SYSTEM, INC.**

4.     Specifically, on December 14, 2007, defendants, **THOMAS H. MILHORAT, M.D.** and **PAOLO A. BOLOGNESE M.D.,** performed spinal cord untethering surgery upon the Plaintiff on the premises of Defendant, **NORTH SHORE – LONG ISLAND JEWISH HEALTH SYSTEM, INC.,** without advising him that the untethering surgery was unnecessary and experimental and that it was not a scientifically accepted method for treating Chiari Malformation.  The safety and efficacy of said untethering surgery as a treatment for Chiari Malformation has never been proven by any published peer reviewed medical or scientific study.

5.     Tethered cord surgery (sectioning of the filum terminale) was not and is not an acceptable scientifically supportable treatment for Chiari I Malformation.

6.     Tethered cord surgery (sectioning of the filum terminale) was and is considered an experimental treatment for Chiari I Malformation.

7.     Defendants recommended and performed tethered cord surgery solely for their financial gain while at the same time utilizing the Plaintiff as a human research subject, without his knowledge and consent.  The tethered cord surgery in no way benefited the Plaintiff, **COREY M. SIMONS.**  To the contrary, the Plaintiff has been caused to suffer severe and irreversible damages that will impact him for the rest of his life.

2

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 based upon the diversity of citizenship of the Plaintiffs and the Defendants and since this action seeks damages in excess of SEVENTY FIVE THOUSAND ($75,000.00) DOLLARS, exclusive of interest and costs.

9.     Venue is proper in this district pursuant to 28 U.S.C. 1391(a).

## THE PARTIES

10.     At all times hereinafter mentioned Plaintiff, **COREY M. SIMONS** resided in the State of Illinois.

11.     At all times hereinafter mentioned, **THOMAS H. MILHORAT, M.D.** (hereinafter referred to as "**MILHORAT**") was and is a physician duly licensed to practice medicine in the State of New York and a citizen of the State of New York, practicing medicine in Nassau County, at 865 Northern Boulevard, Great Neck, New York 11021.

12.     At all times hereinafter mentioned, Defendant, **MILHORAT**, held himself out to the public as a specialist in the area of neurosurgery.

13.     At all   times hereinafter mentioned, **PAOLO A. BOLOGNESE, M.D.** (hereinafter referred to as "**BOLOGNESE**") was and is a physician duly licensed to practice medicine in the State of New York and a citizen of the State of New York, practicing medicine in Nassau County, at 865 Northern Boulevard, Great Neck, New York 11021.

14.     At all times hereinafter mentioned, Defendant, **BOLOGNESE**, held himself out to the public as a specialist in the area of neurosurgery.

3

15. At all times hereinafter mentioned, **SOL MORA, M.D.** (hereinafter referred to as "MORA") was and is a physician duly licensed to practice medicine in the State of New York and a citizen of the State of New York, practicing medicine in Nassau County, at 865 Northern Boulevard, Great Neck, New York 11021.

16. At all times hereinafter mentioned, Defendant, **MORA**, held himself out to the public as a specialist in the area of neurology.

17. At all times hereinafter mentioned, **L. THIERRY REMY, M.D.** (hereinafter referred to as "REMY") was and is a physician duly licensed to practice medicine in the State of New York and a citizen of the State of New York, practicing medicine in Nassau County, at 865 Northern Boulevard, Great Neck, New York 11021.

18. At all times hereinafter mentioned, Defendant, **REMY**, held himself out to the public as a specialist in the area of neurosurgery.

19. At all times hereinafter mentioned, **MISAO NISHIKAWA, M.D.** (hereinafter referred to as "NISHIKAWA") was and is an unlicensed physician, practicing medicine without a license in Nassau County, at 865 Northern Boulevard, Great Neck, New York 11021.

20. At all times hereinafter mentioned, Defendant, **NISHIKAWA**, held himself out to the public as a specialist in the area of pathophysiology and morphometrics.

21. At all times hereinafter mentioned, Defendants, **MILHORAT, BOLOGNESE, MORA, REMY,** and **NORTH SHORE – LONG ISLAND JEWISH HEALTH SYSTEM, INC., THE CHIARI INSTITUTE** and **HARVEY CUSHING INSTITUTES OF NEUROSCIENCE,** held Defendant, **NISHIKAWA**, out as a physician licensed to practice medicine in the State of New York and the world's leading expert on morphometrics.

22.     At all times hereinafter mentioned, Defendants, **MILHORAT, BOLOGNESE,** **MORA, REMY,** and **NORTH SHORE – LONG ISLAND JEWISH HEALTH SYSTEM,** **INC., THE CHIARI INSTITUTE** and **HARVEY CUSHING INSTITUTES OF** **NEUROSCIENCE,** knew or should have known that Defendant, **NISHIKAWA**, was and is an unlicensed physician, practicing medicine without a license in Nassau Country, at 865 Northern Boulevard, Great Neck, New York 11021.

23.     At all times hereinafter mentioned, Defendant, **NORTH SHORE – LONG** **ISLAND JEWISH HEALTH SYSTEM, INC.** (hereinafter referred to as **"NORTH SHORE -** **LIJ"**), was and is a corporation duly organized and existing under the laws of the State of New York.

24.     At all times hereinafter mentioned, Defendant, **NORTH SHORE - LIJ**, by its agents, servants and employees, controlled, managed and operated the hospital located at 300 Community Drive, Manhasset, New York 11030, in the State of New York, County of Nassau, for the care and treatment of persons afflicted with illness and disease.

25.     At all times hereinafter mentioned, **THE CHIARI INSTITUTE** (hereinafter referred to as **"TCI"**), was and is an unincorporated entity of Defendant, NORTH SHORE – LIJ, located at 865 Northern Boulevard, Great Neck, New York 11021.

26.     At all times hereinafter mentioned the Defendant, **TCI,** was and is owned, controlled, managed and operated by Defendant, **NORTH SHORE – LIJ**.

27.     At all times hereinafter mentioned the Defendant, **TCI,** was and is controlled, managed and operated by the Board of Directors of Defendant, **NORTH SHORE – LIJ.**

28.     At all times hereinafter mentioned, **HARVEY CUSHING INSTITUTES FOR** **NEUROSCIENCE** (hereinafter referred to as **"HARVEY CUSHING"**), was and is an

unincorporated entity of Defendant, NORTH SHORE – LIJ, located at 865 Northern Boulevard, Great Neck, New York 11021.

29.    At all times hereinafter mentioned the Defendant, **HARVEY CUSHING**, was and is owned, controlled, managed and operated by Defendant, **NORTH SHORE – LIJ.**

30.    At all times hereinafter mentioned the Defendant, **HARVEY CUSHING**, was and is controlled, managed and operated by the Board of Directors of Defendant, **NORTH SHORE – LIJ.**

31.    At all times hereinafter mentioned, Defendant, **NORTH SHORE – LIJ** and its Board of Directors, were responsible for the medical care rendered and the medical research being performed at Defendant, **TCI.**

32.    At all times hereinafter mentioned, Defendant, **NORTH SHORE – LIJ** and its Board of Directors, were responsible for the medical care rendered and the medical research being performed at Defendant, **HARVEY CUSHING.**

33.    At all times herein mentioned, Defendant, **MILHORAT**, was an agent, servant and/or employee of Defendant, **NORTH SHORE – LIJ.**

34.    At all times hereinafter mentioned, Defendant, **MILHORAT**, was a private attending physician with privileges to admit patients to Defendant, **NORTH SHORE – LIJ.**

35.    At all times hereinafter mentioned, Defendant, **MILHORAT**, was the Chief of Neurosurgery at Defendant, **NORTH SHORE – LIJ.**

36.    At all times hereinafter mentioned, Defendant, **MILHORAT**, was an agent, servant and/or employee of Defendant, **TCI.**

37.    At all times hereinafter mentioned, Defendant, **MILHORAT**, was the Director of Defendant, **TCI**, and was responsible for overseeing the medical care rendered and the medical research being performed at said facility.

38.    At all times hereinafter mentioned, Defendant, **MILHORAT**, was the Director of Defendant, **HARVEY CUSHING**, and was responsible for overseeing the medical care rendered and the medical research being performed at said facility.

39.    At all times herein mentioned, Defendant, **MILHORAT**, was an agent, servant and/or employee of Defendant, **HARVEY CUSHING**.

40.    At all times herein mentioned, Defendant, **BOLOGNESE**, was an agent, servant and/or employee of Defendant, **NORTH SHORE – LIJ**.

41.    At all times herein mentioned, Defendant, **BOLOGNESE**, was an attending physician with privileges to admit patients to Defendant, **NORTH SHORE – LIJ**.

42.    At all times hereinafter mentioned, Defendant, **BOLOGENSE**, was not, and is not board certified in neurosurgery, or in any area of medicine.

43.    At all times hereinafter mentioned, Defendant, **BOLOGNESE**, was an agent, servant and/or employee of Defendant, **TCI**.

44.    At all times herein mentioned, Defendant, **BOLOGNESE**, was an agent, servant and/or employee of Defendant, **HARVEY CUSHING**.

45.    At all times hereinafter mentioned, Defendant, **BOLOGNESE**, was the Assistant Director of **TCI**, and was responsible for overseeing the medical care rendered and the medical research being performed at said facility.

46.    At all times hereinafter mentioned, Defendant, **BOLOGNESE**, was the Assistant Director of **HARVEY CUSHING**, and was responsible for overseeing the medical care rendered and the medical research being performed at said facility.

47.    At all times herein mentioned, Defendant, **MORA** was an agent, servant and/or employee of Defendant, **NORTH SHORE – LIJ.**

48.    At all times herein mentioned, Defendant, **MORA**, was an attending physician with privileges to admit patients to Defendant, **NORTH SHORE – LIJ.**

49.    At all times hereinafter mentioned, Defendant, **MORA**, was an agent, servant and/or employee of Defendant, **TCI.**

50.    At all times herein mentioned, Defendant, **MORA**, was an agent, servant and/or employee of Defendant, **HARVEY CUSHING.**

51.    At all times herein mentioned, Defendant, **REMY**, was an agent, servant and/or employee of Defendant, **NORTH SHORE – LIJ.**

52.    At all times herein mentioned, Defendant, **REMY**, was an attending physician with privileges to admit patients to Defendant, **NORTH SHORE – LIJ.**

53.    At all times hereinafter mentioned, Defendant, **REMY**, was an agent, servant and/or employee of Defendant, **TCI.**

54.    At all times herein mentioned, Defendant, **REMY**, was an agent, servant and/or employee of Defendant, **HARVEY CUSHING.**

55.    At all times herein mentioned, Defendant, **NISHIKAWA**, was an agent, servant and/or employee of Defendant, **NORTH SHORE – LIJ.**

56.    At all times hereinafter mentioned, Defendant, **NISHIKAWA**, was an agent, servant and/or employee of Defendant, **TCI.**

8

57.    At all times hereinafter mentioned, Defendant, **NISHIKAWA**, was not a medical resident at Defendant, **NORTH SHORE – LIJ.**

58.    At all times hereinafter mentioned, Defendant, **NISHIKAWA**, was an agent, servant and/or employee of Defendant, **HARVEY CUSHING.**

### FACTUAL SUMMARY

59.    Plaintiff, **COREY M. SIMONS**, was born in 1988.

60.    **COREY M. SIMONS** suffered from various symptoms, including but not limited to occipital and pressure headaches, which was diagnosed as Chiari I Malformation by Dr. Alice Rupp. Plaintiff was also diagnosed with tethered cord syndrome, "acquired" Chairi I malformation, cerebellar prolapse and tonsillar herniation by defendants in October of 2007.

61.    Chiari Malformation is a condition in which brain tissue protrudes into the spinal canal. There are several different forms of Chiari Malformation. The most common type is the Chiari I Malformation. In normal anatomy, the cerebellar tonsils are located just above the level of the foramen magnum. In an individual with Chiari I, the tonsils hang below the level of the foramen magnum into the spinal canal. This is also known as tonsillar herniation.

62.    Plaintiff's mother sought a second opinion concerning her son's treatment and conditions and both she and plaintiff **COREY M. SIMONS**, learned of Defendant, **TCI**, from **TCI**'s internet website which advertized, among other things, that Defendants, **MILHORAT and BOLOGNESE**, were leaders and experts in the treatment of Chiari and in the performance of Chiari surgery.

63.    After learning about Defendant, **TCI**, through Defendant, **TCI**'s website, Plaintiff's mother made an appointment for her son Plaintiff **COREY M. SIMONS** to see the

9

Defendant physicians. The Plaintiff went to said facility for an evaluation as a result of the contents of and representations contained on said website.

64.   The Defendant, **TCI**, a division of **NORTH SHORE – LIJ**, caused a website to be created, managed and operated to *inter alia*, set forth content for and make representations to consumers of medical services in New York State and throughout the United States.

65.   The website of **TCI** and **NORTH SHORE – LIJ** advertises to the public that the physicians at said facility have expertise in the treatment of Chiari Malformations, and other related conditions.

66.   The website of **TCI** falsely advertises to the public that "the neurosurgeons of The Chiari Institute have made major contributions to the basic sciences of Chiari Malformation (CM) and syringomyelia".

67.   The website of **TCI** falsely advertises to the public that it carries out "research projects" supported by a $17.5 million dollar grant from the National Institutes of Health.

68.   The NIH grant advertised on **TCI**'s website does not exist.

69.   The website of the Defendant, **TCI**, posts a video presentation by Defendant, **BOLOGNESE**, entitled "Tethered Cord Syndrome."

70.   The video presentation by Defendant, **BOLOGNESE,** contains knowingly false and misleading information regarding tethered cord syndrome.

71.   Defendant, **BOLOGNESE**, states on said video that when the filum terminale becomes too thick and too tense, it creates a downward displacement of the spinal column, causing a herniation of the cerebellar tonsils or a Chiari Malformation, without informing the public that there are no scientific studies or medical literature supporting this conclusion.

10

72. Defendant, **BOLOGNESE**, claims in the video presentation that Defendant, **TCI**, has developed the "TCI Special," a system for diagnosing tethered cord syndrome by utilizing clinical data, radiologic studies, stimulation tests and morphometrics.

73. Defendant, **BOLOGNESE**, fails to inform the public that the concept of morphometrics as it relates to tethered cord syndrome and Chiari Malformation is a diagnostic tool developed by Defendant, **NISHIKAWA**, an employee of Defendant, **TCI**, who is not licensed to practice medicine in the State of New York. Upon information and belief, Defendant, **BOLOGNESE**, knew that Defendant, **NISHIKAWA**, was not licensed to practice medicine in the State of New York.

74. Defendant, **BOLOGNESE**, on said video presentation fails to inform the public that the concept of morphometrics has not been widely studied or written about in the scientific or peer reviewed medical literature as it relates to tethered cord syndrome or Chiari Malformation.

75. Defendant, **BOLOGNESE**, on said video presentation fails to advise the public that no scientific or medical proof exists proving that morphometrics is useful and efficacious in the diagnosis of tethered cord syndrome and Chiari Malformation.

76. Defendant, **BOLOGNESE**, fails to inform the public on said video presentation that he and the other physicians at Defendant, **TCI**, rely on Defendant, **NISHIKAWA**'s interpretations of radiological studies, said interpretations being performed by Defendant, **NISHIKAWA**, while physically in the State of New York in making the diagnosis of tethered cord syndrome and Chiari Malformation, even though he is not a physician licensed to practice medicine in the State of New York.

11

77.     Once the Plaintiff, **COREY M. SIMONS**, was evaluated at Defendant, **TCI**, he was diagnosed with cerebellar prolapse, tonsillar herniation and "acquired" Chiari I Malformation.

78.     Upon information and belief Defendant, **NISHIKAWA**, performed morphometric interpretations on the Plaintiff, **COREY M. SIMONS'** radiological studies to make a diagnosis of tethered cord syndrome while he was physically present in the State of New York, even though he was not a physician licensed to practice medicine in the State of New York.

79.     Other Defendant physicians relied, in part, upon Defendant, **NISHIKAWA's** interpretations of the Plaintiff, **COREY M. SIMONS'** radiological studies and his diagnosis of tethered cord syndrome to develop a plan of care and treatment for the Plaintiff, **COREY M. SIMONS.** The surgical plan arrived at for Plaintiff was 1. an in hospital trial of Invasive Cervical Traction; Posterior Fossa Decompression; and 3. re-evaluation one to three months later to check the effect of the posterior fossa surgery on the Chiari Malformation and then performance of a Sectioning of the Filum Terminale (SFT or "detethering surgery").

80.     On November 12, 2007 plaintiff underwent Invasive Cervical Traction and placement of cranial tongs to ostensibly rule out craniocervical instability. Defendants **MILHORAT** and **REMY** performed this procedure on Plaintiff under anesthesia.

81.     On November 14, 2007 plaintiff subsequently underwent a Posterior Fossa Decompression surgery at the hands of defendants **MILHORAT** and **BOLOGNESE** to treat his acquired Chiari I Malformation. This surgery requires opening the back of the skull to provide additional space for the cerebellar tonsils and to provide for proper and sufficient flow of cerebrospinal fluid.

82.    Plaintiff remained in hospital for ten (10) days postoperatively, was scheduled for SFT surgery and was discharged to home.

83.    Plaintiff returned to defendant TCI and underwent a Sectioning of the Filum Terminale (SFT or detethering surgery) at the hands of defendants **MILHORAT** and **BOLOGNESE** on December 14, 2007. Upon information and belief, defendants advised Plaintiff's mother that after the SFT, Plaintiff's spinal cord "jumped up two and one-half (2 and ½) inches.

84.    Plaintiff remained in-hospital for four (4) days and was then discharged to home. Plaintiff was advised and misled by Defendant, **BOLOGNESE,** that this surgery was necessary to cure his tonsillar herniation, cerebellar prolapse and Chiari Malformation.

85.    Plaintiff had little relief from his symptoms after the untethering surgery.

86.    Plaintiff was wrongfully and falsely advised that he was suffering from Tethered Cord Syndrome, a condition where the spinal cord is improperly attached or tethered to the spine and that the tethered cord was contributing to and causing the Chiari Malformation.

87.    The Defendants falsely misrepresented to the Plaintiff that he had Tethered Cord Syndrome and that the symptoms from which he was then suffering were being caused by Tethered Cord Syndrome.

88.    The Defendants, through their deceptive statements made to the Plaintiff, **COREY M. SIMONS,** misled him into believing that the tethered cord surgery would correct his Chiari Malformation, and its associated symptoms. Upon information and belief, Defendants knew that these representations were false.

89.    The Defendants falsely misrepresented to **COREY M. SIMONS** that by not having the tethered cord surgery, the tethered cord would start to pull more and more, causing a

13

worsening of the Chiari Malformation. Upon information and belief, Defendants knew that these representations were false.

90. The Defendants falsely misrepresented to Plaintiff, **COREY M. SIMONS**, that tethered cord surgery would take tension off of the brain.

91. The Defendants failed to advise Plaintiff, **COREY M. SIMONS**, that tethered cord surgery and the alleged benefits that it provides to patients with Chiari Malformation is a highly controversial subject in the field of neurosurgery.

92. The Defendants knowingly misled the Plaintiff into believing that there is an association between Tethered Cord Syndrome and Chiari Malformation and that by operating upon the tethered cord, the Chiari Malformation would be corrected as well.

93. The Defendants misled the Plaintiff into believing that tethered cord surgery is safe and rarely leads to complications.

94. The Defendants did not advise the Plaintiff that tethered cord surgery as it relates to improving Chiari Malformation and Chiari symptoms, has not been widely studied in the scientific and medical community, and that no proof exists establishing that tethered cord surgery can improve Chiari Malformation.

95. The Defendants did not advise the Plaintiff that tethered cord surgery as it relates to improving Chiari Malformation and Chiari related symptoms, has not been widely studied in the scientific and medical community.

96. The Defendants did not advise the Plaintiff that there were no published peer reviewed medical studies in existence establishing that performing tethered cord surgery is a scientifically accepted and efficacious treatment for Chiari Malformation.

97. That Defendants failed to advise the Plaintiff that articles written by physicians associated with Defendant, **TCI**, on the topic of tethered cord surgery as a treatment for Chiari Malformation had been submitted for publication but had been rejected by peer reviewed medical journals.

98. The Plaintiff, **COREY M. SIMONS,** underwent untethering [SFT] surgery to correct his Chiari Malformation on December 14, 2007 at **NORTH SHORE – LIJ,** which was performed by Defendants, **MILHORAT** and **BOLOGNESE.**

99. Defendant, **MILHORAT**, acted as the primary surgeon and was assisted during the procedure by Defendant, **BOLOGNESE.**

100. The Plaintiff, **COREY M. SIMONS,** has sustained severe and permanent injuries as a result of the multiple surgeries that he had at **TCI.**

101. The Defendants induced the Plaintiff, **COREY M. SIMONS,** to have experimental tethered cord surgery which he did not need, solely for their financial gain, full well knowing that there is no scientific or medical proof that tethered cord surgery provides any real improvement of the patient's Chiari Malformation or Chiari related symptoms.

102. The Defendant, **BOLOGNESE**, presented a lecture at the meeting of the Association of Syringomyelia held in July, 2008, in Arlington, Virginia, which is available on the internet wherein he stated that a prospective study in tethered cord surgery had been and was being performed at Defendant, **TCI**.

103. The Defendants performed tethered cord surgery upon the Plaintiff, without advising him that the surgery was experimental in nature as it related to the treatment of his Chiari Malformation and Chiari related symptoms, or that his case would be studied and

15

included in a nationwide study that was being performed on a condition known as Ehler's-Danlos Syndrome, which the Defendants claimed was connected to Tethered Cord Syndrome.

104.    Upon information and belief, without the Patient's consent, pathologic studies were performed upon specimens removed from the Plaintiff's body during the unnecessary Tethered Cord Surgery, solely for purposes of gathering information for the various studies being conducted at TCI.

105.    The Defendants neither advised the Plaintiff about the experimental nature of the surgery, nor did the Defendants ask the Plaintiff to sign a consent form of the type that would be required for participation in human experimentation.

106.    The Plaintiff, **COREY M. SIMONS**, now suffers from significant injuries arising from the performance of the unnecessary and medically useless surgery performed by Defendants, **MILHORAT** and **BOLOGNESE**, at Defendant, **NORTH SHORE – LIJ,** some of these injuries include, but are not limited to, debilitating back pain in the area of the tethered cord surgery, continued and worsening headaches

107.    In addition to suffering physical and emotional injuries, the Plaintiff has been caused to suffer financially as a result of having the unnecessary surgery recommended by the Defendants, including but not limited to, having to expend monies not covered by insurance, such as the initial consultation fee charged by Defendants.

108.    The Plaintiff was covered by medical insurance at the time of her treatment by the Defendants.

109.    The Defendants charged the Plaintiff in excess of $50,000.00 for the unnecessary surgery they performed, and Plaintiff's health insurance carrier paid a portion of those charges.

16

110.   The Plaintiff's health insurance carrier under an equitable or contractual right of subrogation or under ERISA will seek reimbursement from the Plaintiff if he recovers monetary damages from this case.

111.   In the event that the Plaintiff recovers a monetary award from this case, he will be required to reimburse his health insurance carrier for the payments it has made to the Defendants and to his subsequent treating physicians who have treated his damages sustained in connection with the Defendants' malpractice.

112.   The fact that the Plaintiff will need to repay monies to his health insurance carrier is a direct and proximate result of the Defendants' fraudulently recommending and performing unnecessary surgery upon him, while knowing that said surgery was unnecessary and useless.

## AS AND FOR A FIRST CAUSE OF ACTION
### (MEDICAL MALRPACTICE)

113.   That Plaintiff, **COREY M. SIMONS**, initially came under the care of the Defendants, **MILHORAT, BOLOGNESE, MORA, REMY, NISHIKAWA, TCI, HARVEY CUSHING and NORTH SHORE - LIJ**, in or about October of 2007.

114.   That the Defendants, **MILHORAT, BOLOGNESE, NORTH SHORE – LIJ, TCI** and **HARVEY CUSHING**, negligently performed surgery upon Plaintiff, **COREY M. SIMONS**, on November 12, 2007, November 14, 2007 and December 14, 2007.

115.   That Defendant, **NISHIKAWA**, reviewed the Plaintiff, **COREY M. SIMONS.'** MRI's and other radiological studies and helped formulate the Plaintiff's diagnosis of alleged tethered cord syndrome and plan of care.

116.   That the Plaintiff, **COREY M. SIMONS**, continued to receive care from each of the Defendants until approximately December 18, 2007.

17

117.    That at all times herein mentioned, the Defendants had a duty to use reasonable and proper care in their efforts to care for, treat and medicate said Plaintiff.

118.    That the Defendant, **NORTH SHORE – LIJ**, in rendering services to the Plaintiff, owed her the duty to use the degree of care, skill and diligence used by hospitals generally in the community.

119.    That the Defendants, jointly and severally, acting by themselves and through their agents, failed to use due, reasonable and proper care in treating the Plaintiff and deviated from accepted standards of medical care prevailing in the area of neurology, orthopedic surgery and neurosurgery, and the Defendants failed to exercise the knowledge, skill and diligence, which as physicians they should have possessed and exercised on behalf of the Plaintiff, and were otherwise careless and negligent.

120.    That as a result of the foregoing, the Plaintiff, **COREY M. SIMONS,** has sustained serious, severe and irreversible personal injuries, and pain and suffering.

121.    That solely as a result of the aforesaid injuries due to the improper care and treatment on the part of the Defendants, the Plaintiff, **COREY M. SIMONS**, has been subjected to repeated medical therapy, examinations, tests, medications, hospitalizations, and other care, and the Plaintiff, **COREY M. SIMONS**, will continue to require such further treatment in the future.

122.    That the Plaintiff, **COREY M. SIMONS**, has sustained the injuries and damages set forth solely by reason of the carelessness, negligence and lack of skill of the Defendants, without any negligence or carelessness on the part of Plaintiff, **COREY M. SIMONS.**

123. That the Plaintiff, **COREY M. SIMONS**, is entitled to monetary damages stemming from this cause of action in the sum of **TEN MILLION ($10,000,000.00) DOLLARS**.

<h3 align="center">AS AND FOR A SECOND CAUSE OF ACTION</h3>

<h3 align="center">(LACK OF INFORMED CONSENT)</h3>

124. Plaintiff, **COREY M. SIMONS**, repeats and realleges each and every allegation contained in Paragraphs numbered "1" through "123", inclusive, of this Complaint, with the same force and effect as if set forth herein at length.

125. The Defendants were under a duty and obligation to advise and inform the Plaintiff, **COREY M. SIMONS**, of inherent dangers, risks, and consequences of the medical treatment and procedures recommended by the Defendants, and that the Defendants failed, neglected, and/or refused to advise, inform, notify the Plaintiff, **COREY M. SIMONS**, of the apparent risk and possible complications and dangers which might result in the aforesaid procedures and/or treatment recommended.

126. Defendants failed, neglected, and/or refused to inform, advise, notify, and counsel the Plaintiff, **COREY M. SIMONS**, of the possible inherent dangers and risks of said procedures and treatment recommended and performed, and failed to advise and inform the Plaintiff, **COREY M. SIMONS**, of any other method of treatment which might have been used to alleviate the condition from which the Plaintiff, **COREY M. SIMONS**, was suffering.

127. Said failure to advise, inform, notify, and counsel the Plaintiff, **COREY M. SIMONS**, did not afford him adequate knowledge and information so as to determine whether or not he should submit to the aforesaid treatment and, therefore, the Plaintiff, **COREY M. SIMONS**, did not give his informed consent, based upon adequate knowledge of the risks and

dangers of the procedures; but rather, consented based upon information which was inadequate and insufficient upon which to base a decision to submit to the said procedure.

128. By reason of the aforesaid, the treatment given herein was not based upon adequate and sufficient knowledge or informed consent.

129. Plaintiff, **COREY M. SIMONS,** has sustained the injuries and damages, as set forth, solely by reason of the carelessness, negligence, and unskillfulness of the Defendants, and each of them, without negligence or carelessness on their parts contributing thereto.

130. That the Plaintiff, **COREY M. SIMONS,** is entitled to monetary damages stemming from this cause of action in the sum of **TEN MILLION ($10,000,000.00) DOLLARS.**

### <u>AS AND FOR A THIRD CAUSE OF ACTION</u>
### (FRAUD)

131. The Plaintiff, **COREY M. SIMONS,** repeats and realleges each and every allegation contained in Paragraphs numbered **"1"** through **"130",** inclusive, of this Complaint, with the same force and effects as if set forth herein at length.

132. That on or about December 14, 2007, **COREY M. SIMONS.** had surgery at **NORTH SHORE – LIJ,** performed by Defendants, **MILHORAT** and **BOLOGNESE.**

133. That **COREY M. SIMONS,** was fraudulently induced into having surgery by Defendants, **MILHORAT, BOLOGNESE, MORA, REMY, NISHIKAWA, TCI, HARVEY CUSHING** and **NORTH SHORE – LIJ.**

134. That the Defendants falsely advised the Plaintiff that he was suffering from tethered cord syndrome, and that said Defendants knew these statements were false when made.

135. That the Defendants falsely advised the Plaintiff that he needed tethered cord surgery, and that said Defendants knew these statements were false when made.

136. That the Defendants falsely advised the Plaintiff that by undergoing tethered cord surgery, there would be an improvement of his Chiari Malformation and that said Defendants knew these statements were false when made.

137. That the Defendants falsely advised the Plaintiff that by undergoing tethered cord surgery, he would see an improvement in the symptoms associated with Chiari Malformation, and that said Defendants knew these statements were false when made.

138. That the Defendants falsely advised the Plaintiff that the tethered cord surgery would take tension off the bottom of her brain, and that said Defendants knew these statements were falsely made.

139. That these representations were falsely made and, in truth, the Plaintiff did not suffer tethered cord syndrome and, in fact, there was no published medical or scientific proof that Chiari related symptoms or Chiari Malformation can be improved through the performance of tethered cord surgery.

140. That, in fact, the Defendants failed to inform the Plaintiff that tethered cord surgery can adversely affect the patient.

141. That the Defendants fraudulently advised the Plaintiff on their website that Defendants, **TCI** and **HARVEY CUSHING**, are supported by a $17.5 million dollar grant from the NIH which, in fact, does not exist.

142. That Defendant, **BOLOGNESE**, in the video presentation entitled "Tethered Cord Syndrome" posted on Defendant, TCI's website, knowingly and with intent to deceive, advised the public that the Defendants had developed the "TCI Special," a diagnostic system enabling them to diagnose tethered cord through the evaluation of clinical, radiological and stimulation data, and morphometrics.

21

143. That Defendant, **BOLOGNESE**, in the video presentation entitled "Tethered Cord Syndrome" posted on Defendant, TCI's website, knowingly and with intent to deceive failed to advise the public that the use of morphometrics in the diagnosis of tethered cord syndrome, is a concept developed by Defendant, **NISHIKAWA**, an employee by Defendant, **TCI**, who is an unlicensed physician in the State of New York.

144. That Defendant, **BOLOGNESE**, in the video presentation entitled "Tethered Cord Syndrome" posted on Defendant, **TCI**'s website, knowingly and with intent to deceive failed to advise the public that morphometrics has not been accepted as a standard diagnostic tool for tethered cord syndrome.

145. That Defendant, **BOLOGNESE**, in the video presentation entitled "Tethered Cord Syndrome" posted on Defendant, **TCI**'s website knowingly and with intent to deceive failed to advise the public that there are no scientific studies or peer reviewed medical literature in existence demonstrating that morphometrics is useful and efficacious in the diagnosis of tethered cord syndrome.

146. That Defendant, **BOLOGNESE**, knowingly and with intent to deceive failed to advise the public in the video presentation on Tethered Cord Syndrome posted on Defendant, **TCI**'s website, that he and Defendants, and each of them, relied upon Defendant, **NISHIKAWA**'s interpretation of various radiological studies, and his morphometric calculations, in making the diagnosis of tethered cord syndrome, even though Defendant, **NISHIKAWA**, was not, and is not, a licensed medical doctor in the State of New York and was, nonetheless, interpreting these radiologic studies while he was physically present in the State of New York.

147. That the Defendants knowingly and with intent to deceive, failed to advise the Plaintiff, **COREY M. SIMONS,** that Defendant, **NISHIKAWA,** performed morphometric calculations on his MRI's and other radiological studies and helped formulate the diagnosis of tethered cord syndrome and his plan of care while in the State of New York, even though he was not a physician licensed to practice medicine in the State of New York.

148. That the Defendant physicians knowingly and with intent to deceive, failed to advise the Plaintiff that the Defendant physicians relied upon Defendant, **NISHIKAWA's** morphometric interpretations in making the diagnosis of tethered cord syndrome and in formulating the Plaintiff's plan of care even though Defendant, **NISHIKAWA** was not a licensed physician in the State of New York.

149. That the Defendants jointly and severally recommended surgery to the Plaintiff, solely for their own financial gain, knowing full well that there was no scientific proof that these surgeries would be of any benefit to the Plaintiff.

150. That as a result of the knowingly false representations made by the Defendants, the Plaintiff, **COREY M. SIMONS,** was fraudulently induced into having surgery on December 14, 2007.

151. That the Plaintiff, **COREY M. SIMONS,** detrimentally relied on the fraudulent information provided by the Defendants as set forth in the paragraphs above, and agreed to have tethered cord surgery, which was performed by the Defendants on December 14, 2007.

152. As a result of having surgery by the Defendants, the Plaintiff was caused to suffer serious physical, emotional and financial injuries.

153. The Plaintiff has been caused to suffer financially as a result of having the unnecessary surgery recommended by the Defendants, including but not limited to, having to

expend monies for travel and lodging, and medical expenses not covered by insurance, such as the initial consultation fee charged by Defendants.

154. The Plaintiff was covered by medical insurance at the time of his treatment by the Defendants.

155. Upon information and belief the Defendants charged the Plaintiff in excess of **FIFTY THOUSAND ($50,000.00) DOLLARS** for the unnecessary surgery they performed, and Plaintiff's health insurance carrier paid a portion of those charges.

156. The Plaintiff's health insurance carrier under an equitable or contractual right of subrogation will seek reimbursement from the Plaintiff if he recovers monetary damages from this case.

157. In the event that the Plaintiff recovers a monetary award from this case, he will be required to reimburse his health insurance carrier for the payments it has made to the Defendants and to his subsequent treating physicians who have treated his damages sustained in connection with the Defendants' malpractice.

158. The fact that the Plaintiff will need to repay monies to his health insurance carrier is a direct and proximate result of the Defendants' fraudulently recommending and performing unnecessary surgery upon him, while knowing that said surgery was unnecessary and useless.

159. As a result of the fraud perpetrated by the Defendants upon the Plaintiff, **COREY M. SIMONS**, he is entitled to punitive damages.

160. Accordingly, the Plaintiff, **COREY M. SIMONS,** has suffered compensatory and punitive damages in an amount exceeding **TEN MILLION ($10,000,000.00) DOLLARS**.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (VIOLATION OF NYS GBL SECTIONS 349 and 350)

161.    The Plaintiff, **COREY M. SIMONS**, repeats and realleges each and every allegation contained in Paragraphs numbered **"1"** through **"160"** inclusive of this Complaint, with the same force and effect as if set forth herein at length.

162.    The Plaintiff, **COREY M. SIMONS**, was a consumer of medical services provided by the Defendants in the State of New York.

163.    That the making and dissemination of the representations by the Defendants to Plaintiff, **COREY M. SIMONS**, as well as other consumers throughout the United States, as outlined in Paragraphs 59-112 were material and constitute deceptive business practices and acts and false advertising in violation of New York State General Business Law Sections 349 and 350.

164.    Through their aforementioned conduct, Defendants, **MILHORAT, BOLOGNESE, MORA, REMY, NISHIKAWA, NORTH SHORE-LIJ, TCI** and **HARVEY CUSHING**, aided and abetted one another and violated N.Y.S. General Business Law Sections 349 and 350.

165.    The Defendants were unjustly enriched as a result of the aforementioned deceptive business practices and acts and false advertising.

166.    The Plaintiff, **COREY M. SIMONS**, was injured and sustained injuries as a result of the Defendants false business practices and false advertising, in that he was induced into having surgery, that not only failed to improve his symptoms, but made his medical condition worse, to the extent that he will suffer from injuries that he sustained during the surgery of December 14, 2007 for the rest of his life.

167. The Plaintiff, **COREY M. SIMONS**, seeks to recover actual compensatory damages for the injuries he sustained a result of the Defendants' deceptive business practices, acts and false advertising.

168. The Plaintiff, **COREY M. SIMONS**, seeks to recover punitive damages and reasonable attorneys' fees and costs as a result of the Defendants' deceptive business practices, acts and false advertising pursuant to the New York State G.B.L. Section 349 and 350.

169. That due to the Defendants deceptive business practices, the Plaintiff, **COREY M. SIMONS**, has been damaged in the sum of **TEN MILLION ($10,000,000.00) DOLLARS.**

### AS AND FOR A FIFTH CAUSE OF ACTION
### (NEGLIGENT HIRING AND RETENTION)

170. The Plaintiff, **COREY M. SIMONS**, repeats and realleges each and every allegation contained in Paragraphs numbered "**1**" through "**169**", inclusive of this Complaint, with the same force and effect as if set forth herein at length.

171. That the Defendants, **MILHORAT, BOLOGNESE, MORA, REMY,** and **NISHIKAWA,** were employees of Defendant, **NORTH SHORE – LIJ.**

172. That the Defendant, **NORTH SHORE – LIJ,** owed the Plaintiff the duty to hire employees who were fit to treat the conditions she was suffering from.

173. That the Defendants were unfit to render treatment to the Plaintiff, **COREY M. SIMONS.**

174. That Defendant, **NORTH SHORE – LIJ,** should have known through the exercise of reasonable diligence, that the Defendants were unfit to practice medicine and dangerous and that said Defendants were performing unnecessary surgeries solely for financial gain, and should have further known that the Defendants were conducting human experimentation without having the proper consent.

175. That there was a foreseeable risk of harm to the Plaintiff, **COREY M. SIMONS.**

176. That Defendant, **NORTH SHORE - LIJ**'s negligence in hiring and retaining the Defendants, **MILHORAT, BOLOGNESE, MORA, REMY,** and **NISHIKAWA,** caused the Plaintiff to suffer severe and irreversible injuries from which she will suffer for the rest of her life.

177. That the Plaintiff, **COREY M. SIMONS,** is entitled to monetary damages stemming from this cause of action in the sum of **TEN MILLION ($10,000,000.00) DOLLARS.**

**WHEREFORE,** Plaintiff, **COREY M. SIMONS** demand judgment against the Defendants:

(a) on the **FIRST CAUSE OF ACTION** in the sum of **TEN MILLION ($10,000,000.00) DOLLARS;**

(b) on the **SECOND CAUSE OF ACTION** in the sum of **TEN MILLION ($10,000,000.00) DOLLARS;**

(c) on the **THIRD CAUSE OF ACTION** in the sum of **TEN MILLION ($10,000,000.00) DOLLARS;**

(d) on the **FOURTH CAUSE OF ACTION** in the sum of **TEN MILLION ($10,000,000.00) DOLLARS;**

(e) on the **FIFTH CAUSE OF ACTION** in the sum of **TEN MILLION ($10,000,000.00) DOLLARS; and**

(f) together with costs, interest and disbursements of this action, and for such other and further relief that this Court deems just and proper.

Dated: New York, New York
       May 5, 2010

                                 **GOLDSMITH CTORIDES &**
                                 **RODRIGUEZ LLP**
                                 Attorneys for Plaintiffs

By:

                                 LEE S. GOLDSMITH (LSG 8875)
                                 CHRISTINA CTORIDES (CC 5271)
                                 A Member of the Firm
                                 Office & P.O. Address
                                 747 Third Avenue, 37th Floor
                                 New York, New York 10017
                                 (212) 421-5500

                                 and

                                 **THE LOCKS LAW FIRM, PLLC**
                                 STEVEN P. KNOWLTON
                                 GENE LOCKS
                                 JANET C. WALSH
                                 ANDREW P. BELL
                                 747 Third Avenue, 37th Floor
                                 New York, New York 10017
                                 (212) 838-3333 .

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
COREY M. SIMONS

                            Plaintiff,

      -against-

THOMAS H. MILHORAT, M.D., PAOLO A.
BOLOGNESE, M.D., SOL MORA, M.D., L.
THIERRY REMY, M.D.MISAO NISHIKAWA,
M.D., NORTH SHORE – LONG ISLAND JEWISH
HEALTH SYSTEM, INC. , THE CHIARI
INSTITUTE, an unincorporated entity of North
Shore University Hospital, and HARVEY
CUSHING INSTITUTES OF NEUROSCIENCE, an
unincorporated entity of North Shore University
Hospital,

                         Defendants.
-----------------------------------------------------------------X

Civil Action No.:

**JURY DEMAND**

**JURY DEMAND**

    **PLEASE TAKE NOTICE** that the Plaintiffs demand a trial by jury on all the issues herein.

Dated: New York, New York
      May 5, 2010

                          **GOLDSMITH CTORIDES &
                          RODRIGUEZ, LLP**
                          Attorneys for Plaintiffs

By:                       _____

                          LEE S. GOLDSMITH (LSG 8875)
                          CHRISTINA CTORIDES (CC 5271)
                          A Member of the Firm
                          Office & P.O. Address
                          747 Third Avenue, 37th Floor
                          New York, New York 10017
                          (212) 421-5500

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

COREY M. SIMONS

                       Plaintiff,

      -against-

THOMAS H. MILHORAT, M.D., PAOLO A.
BOLOGNESE, M.D., SOL MORA, M.D., L.
THIERRY REMY, M.D.MISAO NISHIKAWA,
M.D., NORTH SHORE – LONG ISLAND JEWISH
HEALTH SYSTEM, INC. , THE CHIARI
INSTITUTE, an unincorporated entity of North
Shore University Hospital, and HARVEY
CUSHING INSTITUTES OF NEUROSCIENCE, an
unincorporated entity of North Shore University
Hospital,

                       Defendants.

----------------------------------------------------------------X

Civil Action No.

**CERTIFICATE
OF MERIT**

STATE OF NEW YORK   )
                    : ss.:
COUNTY OF NEW YORK)

      **LEE S. GOLDSMITH,** a member of the law firm of **GOLDSMITH, CTORIDES &**

**RODRIGUEZ, LLP.,** hereby affirms the truth of the following:

      That pursuant to the Rules of Civil Procedure §3012(a), the deponent states that he has

conferred with a physician who is a specialist in the field in which the Defendants' practice

medicine and has been advised that sufficient basis exist for the commencement of this medical

malpractice suit.

                                     LEE S. GOLDSMITH (LSG 8875)

Sworn to before me this
5 day of May, 2010

_____
Notary Public

CHRISTINA CTORIDES
Notary Public, State of New York
No. 02CT5032748
Qualified in New York
Commission Expires August 29, 20 10

31

STATE OF NEW YORK   )
                        : ss.:
COUNTY OF NEW YORK  )

**LEE S. GOLDSMITH,** being duly sworn, deposes and says:

I am a member of the law firm of **GOLDSMITH, CTORIDES & RODRIGUEZ, LLP,** attorneys for the Plaintiffs in the within action. That I have read the foregoing Complaint and Jury Demand and know the contents thereof; that the same is true, to my knowledge, except as to the within matters stated to be alleged upon information and belief, and that, as to those, I believe them to be true. That the sources of my information are papers and records in Deponent's possession and file. That the reason this Verification is made by your Deponent, and not by said Plaintiffs, are that the Plaintiffs do not reside within the County wherein your Deponent maintains his office.

LEE S. GOLDSMITH (LSG 8875)

Sworn to before me this
5 day of May, 2010.

Notary Public

CHRISTINA CTORIDES
Notary Public, State of New York
No. 02CT5032748
Qualified in New York
Commission Expires August 29, 20 10

32